**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| LATONYA EVANS, | : | MOTION TO VACATE |
| Fed. Reg. No. 65865-019, | : | 28 U.S.C. § 2255 |
|    Movant, | : | |
| | : | CRIMINAL NO. |
|    v. | : | 1:14-CR-52-TWT-JSA-3 |
| | : | |
| UNITED STATES OF | : | CIVIL ACTION NO. |
| AMERICA, | : | 1:16-CV-2362-TWT-JSA |
|    Respondent. | | |

**MAGISTRATE JUDGE'S FINAL ORDER AND REPORT AND
RECOMMENDATION**

In the instant § 2255 motion, Movant seeks to challenge the constitutionality of her sentences, which were imposed on November 24, 2014, following a guilty plea entered in the Northern District of Georgia. (Docs. 100, 105, 109).

I.    Procedural History

On March 19, 2014, a federal grand jury in the Northern District of Georgia returned a four-count superseding indictment charging Movant and two co-defendants, Kendrick Watkins and Charles Jackson, in connection with an armed robbery and shooting of a United States Postal Service employee. (Doc. 32). Movant was charged with two counts therein: in Count One, conspiracy to rob by force and violence, a contract employee of the United States Postal service, of mail matter, packages, money, checks, and financial instruments, in violation of 18 U.S.C. § 1951(a); and in Count Two, armed robbery by force and violence of a United States Postal Service contract employee, whose life was put in jeopardy by

use of a firearm, of the property of the United States, in violation of 18 U.S.C. §§ 2114(a) and (2).  (Doc. 32).[1]

Represented by Tom Hawker, Movant had her initial appearance on March 21, 2014, before Chief U.S. Magistrate Judge Linda T. Walker.  (Doc. 42).  During that hearing, Judge Walker informed Movant of the charges against her in the indictment, and Movant acknowledged that she had received a copy of the superseding indictment and that she understood the nature of the charges against her.  (Doc. 195 at 3-4).

Judge Walker subsequently appointed Jay Strongwater to represent Movant. (Doc. 44; Doc. 195 at 3).   On March 26, 2014, while represented by Mr. Strongwater and his daughter, Emily Strongwater, Movant was arraigned and again was informed of the charges against her.  (Govt. Ex. 3 at 2).  After the Court summarized the superseding indictment in detail, Mr. Strongwater informed the Court that Movant had received a copy of the indictment and understood the nature of the charges pending against her.  (*Id.*).

Movant received a bond hearing immediately after arraignment [Doc. 49], during which the Government outlined in detail the overall conspiracy and Movant's involvement therewith.  (*Id.* at 5-11).  During the bond hearing the Government also noted that Count One carried a maximum sentence of twenty

---

[1] The original indictment only charged Movant's co-defendants.  (Doc. 1).

2

years of imprisonment and Count Two carried a maximum sentence of twenty-five years of imprisonment.  (Govt Ex. 3 at 7).  Following the hearing, the Court ordered that Movant be detained pending trial.  (Doc. 50).

Through the Strongwaters, Movant appealed the detention order to the district court.  (Doc. 61).  Chief U.S. District Court Judge Thomas W. Thrash, Jr., held a hearing on the appeal on May 15, 2014, during which the Government again outlined in detail the overall conspiracy and Movant's specific conduct in connection therewith.  (Doc. 199 at 3-4).  This time the Government highlighted several pieces of evidence against Movant and noted that the evidence was overwhelming, including cell tower data, witnesses, cooperators, and forensic evidence.  (*Id.* at 3).  Following arguments from both sides, the Court denied Movant's request for bond and ordered that she remain detained.  (Docs. 64, 68).

The Strongwaters continued to represent Movant until May 28, 2014, when Ricky Morris filed an entry of appearance, apparently retained by Movant's family.  (Doc. 75; Doc. 209 at 45, 59; Doc. 208 at 9).  Prior to Morris's appearance, however, the Strongwaters requested authorization from the Court to spend more than $2800.00 for an expert psychologist in order to pursue some type of coercion or battered women's syndrome defense [Doc. 69], which the Court denied [Doc. 77].  On July 2, 2014, the Court set a trial date for September 22, 2014, and a pretrial conference for September 9, 2014.  (Doc. 84).  On August 5, 2014, co-

AO 72A
(Rev.8/82)

defendant Jackson entered a guilty plea to Counts Two and Three of the superseding indictment pursuant to a plea agreement in which he agreed to cooperate with the Government, and he subsequently received a sentence of 228 months of imprisonment.  (Docs. 91, 131).  On August 13, 2014, co-defendant Watkins entered a similar guilty plea, to Counts Two and Three of the superseding indictment pursuant to a plea agreement in which he agreed to cooperate with the Government, and he subsequently received a sentence of 220 months of imprisonment.  (Docs. 95, 133).

On September 9, 2014, while still represented by Mr. Morris, Movant entered into a binding plea of guilty to Count One of the superseding indictment.[2] (Doc. 100).  During the plea hearing, Judge Thrash told Movant to listen carefully to Assistant United States Attorney ("AUSA") John Ghose's summary of the evidence:

> This case involves the robbery and shooting of a postal truck driver on December 20, 2013, at the U.S. post office in Conley, Georgia. The two Defendants who shot and robbed the victim that night were named Charles Jackson and Kendrick Watkins who have already pleaded guilty in this matter, are the individuals who actually committed, physically committed the robbery and shooting of the victim in this case on December 20, 2013.

_____

[2] A binding plea, used rarely, is where a defendant and the Government agree to a fixed sentence.  (Doc. 207 at 30-32).  The Court may accept or reject the plea, but if it accepts it, the sentence is that to which was agreed, and if the Court rejects it the defendant can negotiate a plea or proceed to trial.  (*Id.*).

4

Ms. Evans's role in this case is as an aider and abettor and co-conspirator with Defendants Watkins and Jackson. Specifically, Ms. Evans who at the time was an employee of the United States Post Office in Jackson, Georgia, provided certain information to her co-conspirators, Defendants Watkins and Jackson, that enabled them to plan and commit the robbery of the postal truck driver on December 20, 2013, in Conley, Georgia.

That truck driver had been making a routine pick-up of scheduled mail, parcels and postal remittance deliveries on the day that he was robbed which included stops at various offices ending in Conley, Georgia. It was at Conley, Georgia, when the Defendant [sic] was approached in the evening of December 20th – where the victim was approached by Defendants Jackson and Watkins on the evening of December 20th where the robbers aided and abetted by each other pointed a gun at the victim, shot him and stole the postal proceeds, including cash, out of the truck, out of the postal truck that was in the lawful control of the victim in this case who is identified as T.F. in the indictment. Ms. Evans' co-conspirators, Watson and Jackson, after the shooting took away the truck which contained a hundred pieces of mail, postal remittances and U.S. currency totaling $13,683 and other property.

(Doc. 105 at 21). Immediately afterward Judge Thrash asked Movant if there was anything the Government's attorney stated about the facts of the case with which she disagreed, to which she responded, "No sir." (*Id.* at 22).

On November 21, 2014, Judge Thrash sentenced Movant to 188 months of imprisonment, Movant filed a notice of appeal on December 5, 2014, and the Eleventh Circuit granted Mr. Morris's motion to withdraw and appointed new counsel for Movant on July 23, 2015. (Docs. 108, 109, 110, 111, 152, 153). On January 12, 2016, the United States Circuit Court of Appeals for the Eleventh Circuit affirmed Movant's conviction and sentence. (Docs. 154, 155).

5

Movant filed a *pro se* motion to vacate sentence under 28 U.S.C. § 2255 on June 29, 2016, under *Johnson v. United States*, __ U.S. __, 135 S. Ct. 2551 (2015).[3]  (Doc. 161).  Movant filed an amended § 2255 motion on August 8, 2016, and raised four general claims of ineffective assistance of counsel, in that counsel was ineffective at all stages of the proceedings: *i.e.,* pretrial, investigation and plea, sentencing, and appeal.[4]  (Doc. 165 at 4-10).  Specifically, Movant claims that trial counsel was ineffective by failing to:

(1)   listen to Movant's pleas of innocence or investigate anything she asked;

(2)   explain the elements of the offense;

(3)   challenge inaccuracies in the Presentence Investigation Report ("PSR");

(4)   explain the binding plea agreement;

(5)   explain legal terminology, visit Movant more than twice, and show her the PSI before the sentencing hearing;

---

[3] In *Johnson*, the Supreme Court invalidated the residual clause in the Armed Criminal Career Act ("ACCA"), contained in 18 U.S.C. § 924, as unconstitutionally vague.  *Johnson*, 135 S. Ct. at 2555-56.  Movant was not sentenced under the ACCA, and thus *Johnson* is inapplicable. And Movant's amended complaint makes no mention of *Johnson*.  The undersigned therefore will presume that any *Johnson* claim has been abandoned.

[4] Movant subsequently abandoned her claims of ineffective assistance of appellate counsel.  (Doc. 207 at 6; Doc. 226 at 5 n.3).

(6)     explain her option for an *Alford* plea;[3]

(7)     compare Movant's criminal history with that of her co-defendants;

(8)     present her twenty character reference letters;

(9)     call family members or friends to testify;

(10)   review discovery with Movant;

(11)   protect Movant from sentencing enhancements for violence;

(12)   understand the applicable sentencing guidelines;

(13)   raise the disparity between Movant's and her co-defendants' sentences; and

(14)   raise mitigating factors based on threats.

(Doc. 165).  In its preliminary response to the § 2255 motion, the Government requested that the Court schedule an evidentiary hearing.  (Doc. 171).   On November 22, 2016, Judge Thrash referred the matter to the undersigned to appoint counsel and conduct an evidentiary hearing [Doc. 178], the undersigned appointed Stephen Scarborough to represent Movant in these proceedings, and conducted an evidentiary hearing on April 25, 2017, May 23, 2017, and June 28, 2017, during which several witnesses testified.  (Docs. 179, 200, 201, 202, 203, 205, 207, 208, 209).   Movant filed her post-hearing brief on September 29, 2017

---

[3] An *Alford* plea occurs when a defendant permits judgment to be entered against him on an intelligent plea of guilty accompanied by a claim of innocence. *North Carolina v. Alford*, 400 U.S. 25, 37-38 (1970).

7

[Doc. 226], and the Government filed its response on October 30, 2017 [Doc. 230]. Both parties' requests for leave to file excess pages [Doc. 227; Doc. 230 at 1 n.1] are hereby **GRANTED** *nunc pro tunc*.

In her post-hearing brief, Movant appears to focus on five ineffective assistance of counsel claims, first that Mr. Morris was *per se* ineffective because he was addicted to drugs, and also because Mr. Morris failed to visit Movant, review discovery or sufficiently discuss the case with Movant, and/or because Morris negotiated an inadequate plea agreement.  (*See generally* Doc. 226).

II.    Applicable Law

A.    Standard of Review

Congress enacted § 2255, authorizing convicted criminal defendants to file a motion to correct sentences that violate federal law, with the intention that the statute serve as the primary method of collateral attack on federally-imposed sentences.  *United States v. Jordan*, 915 F.2d 622, 625 (11th Cir. 1990).  Pursuant to § 2255, individuals sentenced by a federal court can attack the sentence imposed by claiming one of four different grounds: "(1) that the sentence was imposed in violation of the Constitution or laws of the United States, (2) that the court was without jurisdiction to impose such sentence, (3) that the sentence was in excess of the maximum authorized by law, and (4) that the sentence is otherwise subject to collateral attack."  *Hill v. United States*, 368 U.S. 424, 426-27 (1962) (internal

8

quotation marks and citations omitted); *see generally United States v. Hayman*, 342 U.S. 205 (1952).

"[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982). Movant must establish that the facts surrounding his claim present "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Bowen v. Johnston*, 306 U.S. 19, 27 (1939).

    B.   <u>Ineffective Assistance of Counsel</u>

The standard for evaluating ineffective assistance of counsel claims was set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Green v. Nelson*, 595 F.3d 1245, 1239 (11th Cir. 2010). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 687). To establish deficiency, a petitioner is required to establish that "counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688)). To establish prejudice, a petitioner must prove a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Allen v. Secretary, Fla. Dep't of Corr.*, 611 F.3d 740, 750 (11th Cir. 2010). The court may

9

"dispose of [the] ineffectiveness [claim] on either of its two grounds." *Atkins v. Singletary*, 965 F. 2d 952, 959 (11th Cir. 1992); *see Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").

*Strickland*'s two-pronged test applies to counsel's representation of a defendant in connection with a guilty plea. *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). The Movant must show that his "counsel's constitutionally ineffective performance affected the outcome of the plea process," *Id.* at 59, by "convinc[ing] the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010). *See also Jackson v. United States*, 463 F. App'x 833, 835 (11th Cir. 2012) ("If [the movant] cannot establish both that counsel misadvised him and that a decision not to plead guilty would have been rational, his claim that his guilty plea was not knowing and voluntary due to counsel's ineffectiveness will fail."). "[A] petitioner's bare allegation that he would not have pleaded guilty is insufficient to establish prejudice under *Strickland*." *Roach v. Roberts*, 373 F. App'x 983, 985 (11th Cir. 2010) (per curiam) (citation omitted).

10

III.   <u>Analysis</u>

Movant spends most of her brief arguing that Ricky Morris's drug abuse and addiction resulted in a complete denial of counsel.  As discussed more thoroughly herein, it became clear during the evidentiary hearing that over a period of years Ricky Morris was, in fact, abusing drugs, possibly during his representation of Movant.  While those circumstances cause this Court to approach with great scrutiny the inquiry of whether Movant received ineffective assistance of counsel, the ultimate conclusion rests on whether any such drug abuse or addiction rendered Morris deficient and whether there is a reasonable probability that but for that deficiency the outcome of the proceedings would have been different.  For the reasons that follow, the undersigned **RECOMMENDS** that the § 2255 motion [Docs. 161, 165] be **DENIED**.

A.   <u>Evidence Presented at the Evidentiary Hearing</u>

Jay and Emily Strongwater, Movant's attorneys from the order of detention through the appeal thereof, testified that the initial discovery they received from the Government was voluminous, that the Government's proffer of evidence at both hearings was "pretty extensive" as well as "pretty damning," and that they thought some type of battered woman's syndrome defense may have been appropriate since Movant had suffered previous abuse, that co-defendant Watkins, Movant's boyfriend at the time of the robbery, was abusive to a previous girlfriend, and that Movant may have felt threatened into providing the co-

11

defendants with the information that they used to rob the postal worker.  (Doc. 207 at 7-8, 21-22, 35, 39-40).  Both attorneys also testified that they had reached out to subsequent counsel Ricky Morris on several occasions, never received a response, and that Morris never obtained from them the discovery they had received from the Government.  (*Id.* at 10, 43-44).

Movant testified on direct examination that:  Ricky Morris never went over discovery with her and only visited her once; she did not know what her options were or what a binding plea was; despite the fact that she told Judge Thrash under oath that she understood the rights she was giving up by entering a plea she did not, in fact, understand because Mr. Morris was telling her what to say by pointing to "yes" or "no" on a piece of paper; she never saw the PSR until after she was sentenced and designated; before they went to court Mr. Morris never explained what her sentence would be, so she thought she could have received anywhere up to fifteen years in prison and thought the judge would be the one to decide; she met with AUSA Ghose and some other people during which Mr. Morris told her she needed to talk to help herself but she did not know or understand what she was doing; and she had been abused by co-defendant Watkins but never had the opportunity to discuss that situation with Mr. Morris.  (Doc. 207 at 57-70). Movant stated that had she known what sentence she would receive and what a binding plea meant, she never would have entered a plea and would have insisted that Mr. Morris try for a better outcome.  (*Id.* at 70).  On cross-examination,

Movant appeared very confused any time she was presented with facts contradicting what she said during her direct testimony, and claimed that she did not recall a lot of information, including the conversations she had with Mr. Morris and AUSA Ghose regarding the evidence, the plea deal, and her sentencing prospects if she went to trial or entered a plea. (Doc. 207 at 70-108). Many times she contradicted herself.

For example, she testified on direct that she did not understand what a binding plea meant or that she would receive a 188 month sentence, and that she did not learn of the binding plea until sentencing. (Doc. 207 at 62, 64, 67). When Government counsel pointed out that the Court and AUSA Ghose explained to her during the plea hearing that she was entering into a binding plea to 188 months, and that she had told the Court that she did, in fact, understand, Movant at first still claimed that although it was read to her she didn't "get[] the effect of it[.]" (*Id.* at 139). She later conceded, however, based on the fact that the binding plea to 188 months was explained to her on many occasions – by AUSA Ghose before her plea, by the Court and AUSA Ghose during the plea, and by AUSA Ghose during sentencing – that the first time she learned about the binding plea at least as of the plea hearing if not before. (*Id.* at 140-42).

Movant also admitted on cross-examination that she was, in fact, guilty to Count One of the indictment - the charge to which she entered her plea; that she was telling the truth during her plea colloquy, including when she told Judge

13

Thrash that she had sufficient time to think about and discuss the matter fully with her attorney before entering her plea; that she was satisfied with her attorney's representation; and that there was no evidence discussed by AUSA Ghose with which she disagreed about the facts of the case. (Doc. 207 at 122, 125-29).

Movant remembered having a meeting with AUSA Ghose, Mr. Morris, and Joanna Hobgood, Morris's intern at the time, after the plea but before sentencing, where Movant was provided the opportunity to cooperate and potentially lower her sentence. (*Id.* at 128). She remembered that AUSA Ghose played a recording of her telling a family member that she was innocent even though she had entered a plea. (*Id.* at 129-31). She also admitted that AUSA Ghose told her that the Government was concerned that she was professing innocence after entering a guilty plea and left her in the room with Mr. Morris and Ms. Hobgood. (*Id.*). At first Movant said she could not recall what, if anything, Mr. Morris told her during that private conversation [*Id.* at 130], but upon further questioning she admitted that she understood some of what the evidence was against her, that she told AUSA Ghose after he returned that she wanted to maintain her guilty plea, which was true and correct, and that she had told her family that she was innocent because she did not want them to know the full extent of what she had done. (*Id.* at 130-33).

Movant also admitted that she remembered when Judge Thrash told her she could make a statement on her own behalf before imposing a sentence, and that

14

although she had the opportunity to tell the Court whatever she wanted, she apologized to the victim, the Court, and her family. (Doc. 207 at 142-43). In fact, she admitted that she did not complain about Mr. Morris, she did not tell the Court that Mr. Morris allegedly forced her to enter the plea, nor did she inform the Court that Morris was telling her what to say, because she voluntarily entered the plea. (*Id.* at 143-44). On redirect, however, Movant stated that she had not, in fact, told the truth when she told the Court during the plea colloquy that she was satisfied with Mr. Morris's representation. (*Id.* at 145-46).

Joanna Hobgood testified that she was involved in the case after Movant already had entered her plea. (*Id.* at 155). Based on her conversations with Mr. Morris, Ms. Hobgood thought that Morris had a good grasp of the evidence and discovery in the case and that he knew it very well. (*Id.* at 158). Laura Shuffler, Mr. Morris's paralegal, also testified that Morris knew the case very well. (Doc. 208 at 117). Both Ms. Shuffler and Ms. Hobgood explained that Mr. Morris's normal behavior was "hyper." (Doc. 207 at 160; Doc. 208 at 120-21). While after his representation of Movant Ms. Hobgood observed Morris's behavioral changes and knew that he had checked into a rehabilitation facility in October of 2015, she did not see any of those behaviors in 2014 when Mr. Morris was representing Movant. (Doc. 207 at 160). Ms. Hobgood specifically remembered the proffer hearing when AUSA Ghose raised concerns about Movant's calls with family members denying that she was guilty. Ms. Hobgood stated that once the

Government officials left the room, Morris told Movant that he would try the case if that was what she wanted to do, but that the offer was a good offer. (Doc. 207 at 163). Ms. Hobgood further testified that Morris went over the facts with Movant, told her what was good and what was bad, showed her the guidelines and how her proffer would help, and listened to everything Movant said. (*Id.* at 164). At the end of the conversation, Movant told Morris that she wanted to keep her plea. (*Id.* at 163). Mr. Morris also appeared to be coherent and clear headed during the sentencing hearing. (*Id.* at 166).

Ricky Morris was the next witness to testify, and he stated that he visited Movant on at least two occasions at the prison, and two to three times in the courthouse when she had been brought over. (Doc. 208 at 16-17). Morris thought it was in Movant's best interest to enter into a binding plea to 188 months, because although she did not have much of a criminal history, the offense was very serious, involving a shooting victim, so Morris believed that a guaranteed sentence at the lowest end of the guideline range was preferable to a "wild card." (*Id.* at 20, 33). Mr. Morris denied Movant's claim as incorrect that he did not review discovery with her, because he took the discovery with him to the jail and went over it with her. (*Id.* at 32). Mr. Morris also described Movant's claim that he never explained the elements of the charges to her as "not true," as he specifically explained the crimes and offenses to Movant. (Doc. 208 at 32). And Morris also denied that he

16

failed to explain the importance of the PSR and failed to review it with Movant, stating simply, "I went over it with her." (*Id.*).

Mr. Morris stated that he did discuss with Movant that she felt threatened by her co-defendant, but he was unable to substantiate or confirm that information, although he did bring it to AUSA Ghose's attention. (*Id.* at 101-02). After his investigation, he ultimately did not feel that any such threats would amount to such coercion as to alleviate criminal responsibility or mitigate sentencing. (*Id.* at 101).

Mr. Morris openly acknowledged his voluntary suspension from the practice of law based on his substance abuse and psychological issues, as well as problems which resulted from those circumstances including being held in contempt of state court and domestic incidents. (*Id.* at 21-29). He testified that he noticed that these problems affected his performance as a lawyer sometime after Memorial Day in 2015. (*Id.* at 23-24).

Mr. Morris had sought treatment for his drug abuse twice, the last time being March 27, 2016, but he could not recall the year of the first instance. (*Id.* at 39-40). His abuse started after he broke his ankle in 2012 or 2013, and he started taking prescription medication. (*Id.* at 40). For the first few years it consisted mainly of taking more than the prescribed dosage, and he believed that it did not affect him very much. (*Id.* at 25, 40). He later determined that with his psychiatric issues and the prescription medication, however, he needed to receive help. (Doc. 208 at 41-43). In that instance, he filed emergency medical leave of absences in

17

his currently active cases> (*Id.* at 43-44).  No such leave of absence was filed in this case because it was not currently active.  (*Id.* at 43-44).  Mr. Morris stated unequivocally that he was not abusing prescription medication during the time he was representing Movant and thus his drug addiction would not have affected his ability to represent her.  (*Id.* at 96).

The discovery Morris received from the Government was voluminous, and had been transferred to four trial notebooks by his paralegal, Laura Shuffler, which he reviewed.  (Doc. 208 at 16, 44-45, 116).  After first reviewing the discovery, Morris believed Movant's story that she was just the postal worker who had no idea what was going on.  (*Id.* at 45-46).  As the case progressed and he received more discovery, however, it became obvious that Movant had, in fact, involved herself in the conspiracy, *vis-a-vis* the information she provided to her co-defendants who robbed the postal truck and shot the driver.  (*Id.* at 45).  The turning point appears to have been the interviews and proffer sessions with Movant's co-defendants, both of whom implicated Movant.  (Doc. 208 at 46).  Combined with phone records and cell tower pinging records indicating that Movant was on the telephone with co-defendant Watkins around the time of the robbery, a video recording of Movant meeting with Watkins at a Waffle House soon after the robbery, in addition to the interviews of Movant during which Movant's story changed throughout the course of the action, Morris realized that the case against Movant was much stronger than he first had thought.  (*Id.* at 46-

18

47, 61-64).  Mr. Morris went over all of that discovery and evidence with Movant on at least two occasions, discussed the strength of the Government's case against her, and he told her if she went to trial "she would get smashed." (Doc. 208 at 47). He also told Movant that if she went to trial and lost, she could be sentenced to forty-five years of imprisonment.  (*Id.* at 48).

Morris further testified that his normal practice was that the first time he would visit a client he would go over the discovery, the indictment, and what the Government intended to show and what the possible penalties were, and that nothing about Movant's case would have made him deviate from that practice. (*Id.* at 49-50).  The first time he met with Movant, he did, in fact, go over with her the indictment and the nature of the charges, the elements of the offense, and explained to her how conspiracy works.[4]  (Doc. 208 at 50-51).  During that first meeting Morris also discussed with Movant the fact that the Government would be interested in working with her and receiving information from her if she had any. (Doc. 208 at 50-51).  Morris told her that the Government had made a plea offer whereby Movant would enter a plea to Count Two (armed robbery) and the Government would recommend a sentence in the middle of the guideline range of 188-235 months, or somewhere in the middle between fifteen to nineteen years. (Doc. 208 at 50-52).  At that point, however, Movant told Mr. Morris that she was

---

[4] Mr. Morris stated unequivocally that Movant understood the charges.  (*Id.* at 56).

19

not interested, that she was not guilty, that she did nothing wrong, and that she wanted to go to trial.  (*Id.* at 51, 54-55).

Throughout the case Morris communicated with AUSA Ghose, who informed him of the status of the case. (Doc. 208. at 57-59; Govt. Ex. 17, 27, 28, 29).  A trial date was set fairly quickly, and Morris apprised Movant that if she did not accept the plea that they would go to trial "sooner rather than later."  (*Id.* at 59).  Movant never mentioned an *Alford* plea to Mr. Morris, and ultimately any such plea would have been up to the Court to accept because Movant would not be accepting responsibility.  (*Id.* at 60).  Regardless, if she had, in fact, been able to enter an *Alford* plea, she still would have faced the same penalties as if she had gone to trial.  (*Id.*).

AUSA Ghose sent Mr. Morris an email on August 15, 2014, in an attempt to negotiate a plea after both co-defendants had entered their pleas, provided proffers which implicated Movant, and agreed to testify against Movant at trial. (*Id.* at 66.  In that email, AUSA Ghose highlighted the evidence in the case and the strength of that evidence, discussed the difference in the guidelines if Movant accepted a plea versus proceeding to trial.  (Doc. 208 at 69-71).  AUSA Ghose made a new plea offer by which Movant would enter a binding plea for a 188 months sentence to Count One – which had a statutory cap of twenty years and a guideline range of 188 to 235 months – and a chance to reduce that sentence if Movant were to provide substantial assistance to the Government.  (Doc. 208 at

20

67-69).  Mr. Morris thought it was a good offer, as it was substantially lower than the maximum sentence and the previous plea offer as well as the lowest possible sentence in her guideline range.  (Doc. 208 at 68).  He believed it was definitely in Movant's best interest to accept the offer so that she would not risk a much more substantial sentence after a jury trial.[5]  (*Id.* at 69).  AUSA Ghose gave Morris a deadline of September 2, 2014, to accept this offer, but agreed to extend the deadline at Mr. Morris's request.  (*Id.* at 71-74).

At some point thereafter, Mr. Morris went to see Movant, talked to her about the binding plea offer, went through it with her as to the terms of the offer, and went through the evidence with her.  (Doc. 208 at 74-75).  At first, Movant did not want to accept the offer, but she finally agreed to do so.  (*Id.*).  The pretrial conference was set for September 9, 2014, and they kept that date so that Movant could enter her plea.  (*Id.*).  Mr. Morris met with Movant that day and went over with her again the terms of the binding plea agreement and the evidence against her.  (*Id.* at 78-80).  After that private conversation, the Government also wanted to make sure that Movant understood the terms of the agreement, the punishment

---

[5] Indeed, the Government's first offer was for Movant to enter a guilty plea to Count Two - the armed robbery count which carried a maximum of twenty-five years – with a joint recommendation for the *middle* of the guideline range of 188-235 months.  (Doc. 208 at 179).  The deal to which Movant eventually entered a plea – a binding plea to Count One – the conspiracy count which carried a twenty-year maximum – was for a binding sentence at the low end of the guideline range, *i.e.,* 188 months.  (*Id.* at 180).

21

range, and their evidence.  (Doc. 208 at 77).  The Government also met with Movant in Mr. Morris's presence and went over all of that information again.  (*Id.* at 77, 80-81). After that meeting Movant entered her plea.  (*Id.* at 81-82).  Morris clarified that during the plea colloquy he always writes "yes" or "no" on a piece of paper – not to tell his client what to say, but to let her know that the judge is asking only for a yes or no answer.  (*Id.* at 82-83).

After the plea Morris and Movant met with the probation officer to go over the PSR.  (Doc. 208 at 84).  Movant never indicated that she regretted entering into her guilty plea, and she indicated that she understood what sentence she faced with her binding plea.  (*Id.* at 84-85).  Mr. Morris explained to her that the PSR was mainly a formality at that point since they had agreed on sentence, and she did not express any confusion about his explanation.  (*Id.* at 85).  Mr. Morris nevertheless went over the PSR with Movant prior to the sentencing hearing, and did not have any issues therewith.  (*Id.*).

Mr. Morris also recalled the proffer meeting between Movant and the Government, during which the Government played the recording of Movant's conversation with a family member where Movant indicated that she entered a guilty plea but was not guilty.  (Doc. 208 at 90-92).  After the Government officials left the room, Mr. Morris told her that part of her plea agreement was to accept responsibility and provide information that potentially could reduce her sentence, and that if she claimed she was innocent she would lose the benefits of

22

these provisions. (Doc. 208 at 92). Just as Ms. Hobgood described, Morris also testified that he went over the evidence again with Movant and about how she was a co-conspirator, but that if she felt she was innocent and wanted to go to trial he would do what she wanted. (*Id.* at 92-93). After that conversation Movant indicated that she wanted to maintain her guilty plea. (*Id.* at 92-93).

Postal Inspector Clinton Potter testified that he and another inspector, Brian Musgrove, investigated the armed robbery and shooting in this case. (Doc. 208 at 142-44). Inspector Potter met Ricky Morris for the first time on September 9, 2014, when the Government met with Movant prior to the scheduled pre-trial conference to make sure that Movant would make an informed decision whether to go to trial or enter a plea. (*Id.* at 145-46). Inspector Potter's first impression of Mr. Morris was that Morris appeared to be well prepared, seemed very engaged, alert, and had a good command of the case. (*Id.*). Potter also was the person who had recorded Movant's conversation with her brother where she told her brother that she entered a plea to something she did not do, and he brought that recording to the meeting on September 23 when Movant was supposed to make a proffer. (Doc. 208 at 149-50). He confirmed that AUSA Ghose first played that recording for Movant and left her to speak with Mr. Morris privately for approximately an hour and fifteen minutes, after which Movant indicated that she wanted to maintain her guilty plea. (*Id.* at 150-51). At that time Movant also told AUSA Ghose that she understood the plea colloquy, the terms of the plea, to what she had pled guilty,

and that she was truthful during her plea colloquy. (*Id.* at 151-52). During the proffer following that discussion, Movant told them how initially she had provided co-defendant Watkins with information about the post office and how it moves money and/or handles counter line transactions, which later evolved into more specific conversations about how they move the money, transport the money on trucks, where the route starts, and that the truck would have a security container on it. (Doc. 208 at 153). That proffer session, however, was not deemed to rise to the level of substantial assistance. (*Id.* at 94, 208).

AUSA Ghose testified that his initial impression of Morris was that Morris was very busy. (Doc. 208 at 158). During Morris's representation of Movant, AUSA Ghose exchanged several phone calls and emails with Morris, relating to both logistics and substance. (*Id.* at 158-59). Because Morris recently had been retained and because the discovery in the case was voluminous, in July or August of 2014, AUSA Ghose picked out what he deemed to be the most salient pieces of discovery and emailed them to Morris directly, as he wanted to draw Morris's attention to what he thought would be most helpful to him and relevant to his representation of Movant. (Doc. 208 at 159). Although AUSA Ghose did not recall having a conversation with Mr. Morris about Movant's toxic relationship with her co-defendant boyfriend, he did recall it being a theory of previous counsel during the appeal of the detention order. (*Id.* at 162, 214). AUSA Ghose

24

considered that fact as a mitigating factor when negotiating the plea. (*Id.* at 162, 214).

The evidence against Movant was very strong, and included cell phone records; reports of Movant's co-defendants' proffers during which both co-defendants implicated Movant; agreements from both co-defendants to testify against Movant at trial; Movant's admissions during taped interviews that she told co-defendant Watkins about the availability of the postal trucks and what they were carrying; Movant's cell phone records and communications with co-defendant Watkins directly before and after the robbery; and a videotape of Movant meeting with co-defendant Watkins at a Waffle House immediately after the robbery.  (Doc. 208 at 188-90).

AUSA Ghose did not think that Movant deserved as much time as her co-defendants since she was not present during the actual robbery and shooting. (Doc. 208 at 162).  On the other hand he believed that Movant could have been subject to a leader/organizer enhancement since she there was some evidence that the robbery was her idea and that she told her co-defendants where and how to commit the robbery, as well as enhancements for abuse of a position of trust and obstruction.  (Doc. 208 at 162, 212; Gov't Exs. 13, 14).  The day of the scheduled pre-trial conference, AUSA Ghose wanted to meet with Mr. Morris and Movant because he had a number of concerns.  (*Id.* at 165-66).  Specifically, the trial was quickly approaching, and he wanted to make sure that Movant understood what she

25

was facing, that in the Government's view it was in her best interest to accept the plea offer, and he wanted to make sure Mr. Morris understood federal practice. (*Id.* at 165-66).   AUSA Ghose felt that it was likely that Movant would be convicted if she went to trial, and since she faced forty-five years in prison if she did so, Ghose thought it was important for him to meet with Movant and Mr. Morris to discuss the offer.  (*Id.* at 195).   During that meeting, AUSA Ghose walked Movant through the sentencing analysis, what she would get if she entered a plea versus her exposure if she went to trial, and reviewed the evidence against her, and then left the room.  (*Id.* at 204).   After Mr. Morris spoke with Movant, Movant told AUSA Ghose that she wanted to enter a plea.  (*Id.* at 204).   In the end, AUSA Ghose felt comfortable with the deal because he had done everything he could to make sure that Movant understood it.  (*Id.* at 203).

AUSA Ghose felt that Mr. Morris seemed to understand the facts, seemed knowledgeable about the case, and absolutely had a good grasp on what the case was about and the seriousness thereof.  (Doc. 208 at 208).  AUSA Ghose had often thought that Morris seemed "off," however, and expressed that perception in an email when he learned of Morris's suspension and addiction issues.  (Doc. 208 at 168, 170-71).  AUSA Ghose clarified that Morris "never seemed totally right when we were dealing with him," because Morris always seemed busy, very distracted, and high strung, like someone who had drunk ten cups of coffee, and Ghose wondered at the time whether Morris might have been on drugs.  (*Id.* at 170-71).

26

Regardless, AUSA Ghose testified that the deal to which Movant entered a plea was "the best she was going to get," as he had multiple meetings with his supervisor and, despite his own feeling that a 188 month binding plea was too harsh given the facts that Movant was not present, her age, and her lack of criminal history, it was his supervisor's decision and not his. (*Id.* at 172, 192, 214). Indeed, Ghose personally advocated for a lower sentence than 188 months, which was rejected by his supervisor. (*Id.* at 203). Thus, Movant's "idea that somehow she was going to get a better deal, it just wasn't going to happen." (*Id.*).

Ghose also discussed the proffer session and Movant's post-plea conversation with her brother in which she appeared to profess her innocence. (*Id.* at 209-10). After playing the recording for Movant, leaving Movant to discuss her plea with Mr. Morris and their follow-up conversation, AUSA Ghose was satisfied that Movant was guilty and that what she had said to her family was not the truth. (*Id.* at 209).

Mr. Morris's ex-wife, Stacey Morris, was Movant's last witness to testify. She explained that she had discovered that Mr. Morris abused drugs and alcohol approximately six months into the marriage back in 2010. (Doc. 209 at 6). She also confirmed, however, that Mr. Morris has a "hyper" disposition regardless. (*Id.* at 6, 29). Right before February of 2014 when Ms. Morris opened her own law firm after filing for divorce, she discovered that Mr. Morris was accepting unprescribed pills as payment for legal services. (*Id.* at 7). Ms. Morris described

27

an incident on July 4, 2014, when Mr. Morris clearly was under the influence of some sort of drug, and they ended up in a domestic dispute where the police were called. (*Id.* at 9-10). She personally was aware of his drug use causing deficits in his practice over the years, and reported those claims to various prosecutors and judges; however, she never reported any of this information to the Georgia bar and she continued to work with him. (*Id.* at 21, 25-26). Ms. Morris could not remember any substantial period of time during their marriage when Mr. Morris was drug free. (*Id.* at 24). Ms. Morris was not involved at all with Movant's case, had never met Movant or spoken with her, and was not aware of anything in Movant's case, including how Mr. Morris handled that representation. (*Id.* at 31-36). She was aware of deficiencies in another case in 2014 where she was co-counsel, in that he was not prepared to examine technical witnesses, ballistics evidence and witnesses, he did not have a grasp of the facts, and he had not filed the proper motions. (*Id.* at 39). Following her testimony, the Government called Mr. Morris for its rebuttal, mostly to confirm that his ex-wife had no involvement whatsoever in Movant's case. (Doc. 209 at 44-45).

The Government also presented a lot of evidence which would have been presented at trial. Both co-defendants Watkins and Jackson entered guilty pleas and made proffers to the Government, implicating Movant, and they both agreed to testify against her at her trial. Specifically, it was Movant's idea to rob the postal truck, she said she wanted fifty percent of the proceeds, told the co-

28

defendants about the route and the best day to go, assisted with surveillance of the area on more than one occasion, and told them they needed to bring a gun and that the victim would not put up a fight because postal workers were trained not to resist. (*See* Govt. Exs. 13, 14). Movant also told her co-defendants that she had successfully assisted with similar postal robberies in the past, and described in detail how the money was placed in bags and put through a slot on top of a small box with a lock. (*Id.*). Both co-defendants stated that during the robbery in this case, Watkins called Evans because the postal truck was late. (Govt. Exs. 13, 14). Immediately after the robbery Movant met with Watkins at a Waffle House, he told her that Jackson had shot the victim and that they did not get as much money as she had estimated, and Movant did not believe him and threatened to report the crime. (Govt. Ex. 13). The three met approximately two weeks later to discuss evading the police, and Movant again assured her co-defendants that she had done this before. (Govt. Exs. 13, 14). Watkins's cell phone records indicated that Watkins was in the vicinity of the robbery at the time of the robbery, was in contact with Movant at least three times immediately before the robbery, that Watkins received multiple call attempts from Movant's home phone number that went unanswered during the robbery, and that later in the evening after the robbery both phones were in contact with each other. (Govt. Ex. 16). Co-defendant Watkins also stated that after the robbery he began restricting use of his cell phone and that Movant began using her niece's cell phone instead of her own to evade

29

detection.  (Govt. Ex. 13).  During her first few interviews Movant initially denied having any knowledge of the robbery, but later had to backtrack after the investigators confronted her with the cell phone records.  (*Id.*).  It was only after Watkins and Jackson were charged that Movant admitted to having a sexual relationship with Watkins and that she had met him at the Waffle House when, according to Movant, Watkins told her that he had robbed her job and a driver had been shot.  (*Id.*).  Despite this info, however, she also admitted that she had not called the police and that he stayed at her house afterward.  (*Id.*).

     B.    <u>Discussion</u>

         1.    <u>The *Cronic* Standard Does Not Apply Here.</u>

Movant argues that the standard in *United States v. Cronic*, 466 U.S. 648 (1984), rather than that set forth in *Strickland*, *supra*, applies to this case. Specifically, the Supreme Court in *Cronic* outlined three circumstances by which counsel could be *per se* ineffective, and prejudice must be presumed: (1) "the complete denial of counsel;" (2) "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" and/or (3) "where counsel is available to assist the accused during trial, but the likelihood that any lawyer, even a competent one, could provide effective assistance is so small that prejudice should be presumed." *Cronic*, 466 U.S. at 658-59.[6]   The *Cronic* exceptions,

---

[6] An example the Supreme Court gave for the third situation was that set forth in *Powell v. Alabama*, 287 U.S. 45, 56-58 (1932), where "young, ignorant,

AO 72A
(Rev.8/82)

however are "narrow," and the standard "extremely high." *Florida v. Nixon*, 543 U.S. 175, 190 (2004); *Hunter v. Moore*, 304 F.3d 1066, 1070 n.4 (11th Cir. 2002). *See also Smith v. Wainright*, 777 F.2d 609, 620 (11th Cir. 1985) (*"Cronic* represents a narrow exception which the Supreme Court has carved out of the general rule that a petitioner claiming ineffective assistance of counsel must demonstrate that he was prejudiced by specific alleged errors in his counsel's performance. . . . Consequently, the burden of proof under *Cronic* is a very heavy one."); *Chadwick v. Green*, 740 F.2d 897, 901 (11th Cir. 1984) ("[W]e believe that when *Cronic* and [*Strickland*] are read in conjunction, it becomes evident that *Cronic*'s presumption of prejudice applies to only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.").

Movant argues that, pursuant to the first situation set forth by the Supreme Court in *Cronic*, this Court should find that Morris was *per se* ineffective, and that prejudice should be presumed, because Morris's addiction to drugs left Movant "so

---

illiterate" defendants "surrounded by hostile sentiment" in a highly publicized capital offense were appointed "all the members of the bar" for arraignment, and then the court appointed the one attorney who showed up the day of trial. *Cronic*, 466 U.S. at 659. The Supreme Court in *Powell* held that "'such designation of counsel as was attempted was either so indefinite or so close upon the trial as to amount to a denial of effective and substantial aid in that regard.'" *Id.* (quoting *Powell*, 287 U.S. at 53).

bereft of counsel that it dictates relief in this case." (Doc. 226). The law does not support Movant's argument.

Indeed, a defendant has not made out a *Cronic* claim that would relieve her of the need to demonstrate prejudice merely because counsel's performance may have been substandard. *Chadwick*, 740 F.2d at 901. "Rather, [a defendant] must show that [her] counsel's performance was so impeded by the circumstances that it is unlikely that any lawyer could have provided effective assistance given the situation." *Id.* Counsel's drug addiction, however, does not fall under the *Cronic per se* prejudice category. *See Kelly v. United States*, 820 F.2d 1173, 1176 (11th Cir. 1987) (declining to apply *Cronic* to ineffective assistance of counsel claim that, *inter alia*, the defendant's attorney was *per se* ineffective because of his drug addiction); *United States v. Washington*, 869 F.3d 193, 204 (3d Cir. 2017) ("We agree with the District Court that the general allegations of alcohol use do not require a departure from *Strickland*'s two-prong standard[.] . . . Alcohol or drug use by trial counsel can certainly be relevant to both parts of an ineffectiveness inquiry, especially if amplified or systemic, or on close questions on strategy and jury perception. But on these facts, alleged substance abuse is not, without more, one of the rare forms of dereliction amounting to the *per se* denial of a defendant's Sixth Amendment right to the effective assistance of counsel."); *Williams v. Trammell*, 782 F.3d 1184, 1200-01 (10th Cir. 2015) (rejecting defendant's argument that *Cronic* applied where his lawyer was "constructively

32

absent" based on counsel's substance abuse, and instead applying *Strickland*, finding that counsel's efforts did not rise to a complete failure, as "[e]ven if [the defendant] could prove that one of his lawyers was really under the influence of drugs or alcohol at trial, this would not negate their professional efforts on his behalf."); *Ivory v. Jackson*, 509 F.3d 284, 295 (6th Cir. 2007) (rejecting the defendant's argument that *Cronic* applied where the defendant claimed that counsel met with him only twice, failed to provide him with documents he requested, and was likely under the influence of drugs, and applying *Strickland* to the defendant's ineffective assistance claims); *Green v. Garnett*, No. 08 cv 3250, 2017 WL 3978704, at *8 (N.D. Ill. Sept. 11, 2017) (finding reasonable the state court's decision rejecting that the petitioner's claim of counsel's mental illness and cocaine addiction was a total denial of counsel under *Cronic* and that the petitioner had to demonstrate prejudice under *Strickland*, which he could not do under the totality of the evidence against him); *Moore v. Florida*, No. 2:07-CV-80-FEM-36DNF, 2010 WL 3833953, at *11 (M.D. Fla. Sept. 28, 2010) (finding that counsel's drug addiction is "not the sort of rare case discussed in *Cronic*, 466 U.S. at 658, and *Chadwick . . .* where prejudice is presumed *per se*."). *See also United States v. Walker*, No. 96-2419, 2000 WL 353518, at *3 (6th Cir. 2000) ("An attorney's drug use, however, does not *per se* constitute ineffective assistance of counsel, nor does it create a presumption of ineffective assistance. The *Strickland*

33

two-pronged analysis remains applicable in situations where the defendant contends that his attorney was ineffective due to drug use.").

Thus, the undersigned must analyze Movant's claims under *Strickland*. Importantly, counsel's drug use or addiction also does not constitute *per se* ineffective assistance even under *Strickland*'s standard.  *See Berry v. King*, 765 F.2d 451, 454 (5th Cir. 1985) ("[U]nder *Strickland* the fact that an attorney used drugs is not, *in and of itself*, relevant to an ineffective assistance claim.  The critical inquiry is whether, for whatever reason, counsel's performance was deficient and whether that deficiency prejudiced the defendant.") (emphasis in original); *United States v. Moses*, Civil Action No. 16-6545, Criminal Action No. 14-232, 2018 WL 563160, at *3 (E.D. Pa. Jan. 25, 2018) ("The use of prescription drugs during or prior to a trial does not render an attorney *per se* ineffective."); *United States v. Katopodis*, Nos. 2:12-cv-8047-KOB-TMP; 2:08-cr-418-KOB-TMP; 2014 WL 4681435, at *3 (N.D. Ala. Sept. 16, 2014) ("Even if [counsel] did suffer from addiction during trial . . . addiction alone is insufficient to render an attorney's performance insufficient."); *Phelps v. Davenport*, No. 5:13-cv-0273-SLB-JEO, 2014 WL 2006321, at *14 (M.D. Ala. May 13, 2014) ("[A]bsent specific allegations that counsel's drug use or health issues actually caused some act or omission constituting deficient performance, such a claim fails under *Strickland*'s first prong."); *Corbette v. Cate*, No. C 12-2070 PJH (PR), 2014 WL 231956, at *16 (N.D. Cal. Jan. 21, 2014) ("[E]ven a drug-addicted attorney does

34

not constitute an automatic violation of *Strickland*, nor does it create a presumption of ineffective assistance of counsel."). Thus, this Court must review each alleged instance where Movant claims she received ineffective assistance of counsel under *Strickland*.

 2. <u>Movant Did Not Receive Ineffective Assistance Of Counsel.</u>

 a. <u>Movant Has Not Demonstrated Any Deficiency In Morris's Representation.</u>

Insofar as Movant's specific ineffective assistance of counsel claims, Movant has failed to demonstrate that Morris was deficient in his representation of her and/or that a decision to reject the plea bargain would have been rational under the circumstances. *Hill*, 474 U.S. at 59; *Padilla v. Kentucky*, 559 U.S. at 372; *Jackson*, 463 F. App'x at 835.

 1. *Infrequent And/Or Brief Visits*

First, Movant has failed to show any deficiency in Mr. Morris's alleged failure to visit her. Indeed, Movant herself claims that Morris met with her on five occasions. (*See* Doc. 226 at 6). Regardless, under *Strickland*, allegations of infrequent visits and/or visits of short duration are not enough to demonstrate that counsel was ineffective without evidence of prejudice. *See Bowling v. Parker*, 344 F.3d 487, 506 (6th Cir. 2003) ("[T]he mere fact that counsel spent little time with [petitioner] is not enough under *Strickland*, without evidence of prejudice or other defects."); *United States ex rel. Kleba v. McGinnis*, 796 F.2d 947, 954 (7th Cir.

35

1986) (stating that there is no minimum number of meetings necessary between counsel and client prior to trial in order for counsel to be effective); *United States ex rel. Testamark v. Vincent*, 496 F.2d 641, 642-43 (2d Cir. 1974) (rejecting ineffective assistance of counsel claim where, *inter alia*, the petitioner failed to show that his attorney's infrequent visits impaired his defense).  As will be discussed further herein in Section III.B.2.b., Movant has not demonstrated any prejudice.  Moreover, although Movant challenges the brevity and/or infrequency of Morris's meetings with her, it is clear from several witnesses, the Government's exhibits, and even Movant's concession [Doc. 226 at 17], that despite the fact that Morris had an extremely busy state court schedule, he had detailed knowledge of the facts and issues in the case after having had reviewed the voluminous discovery, and continually worked on the case and communicated with AUSA Ghose on several occasions – via email and telephone – before advising Movant to enter a guilty plea on the day of the scheduled pre-trial conference.

   2.   *Failure To Discuss Case And Review Discovery*

Movant also alleges that Morris failed to fully discuss the case and/or discuss the discovery with her, and she claimed during her testimony that she had no idea what was going on and did not understand anything.  This claim contradicts Movant's sworn statements at the plea hearing, contradicts other testimony, and is simply incredible.

36

Indeed, as the Government points out, Movant met with the Strongwaters on at least seven occasions, where one or both of them explained the charges to her and reviewed some discovery with her, and she told the Court under oath on several occasions that she understood the charges against her. Even Movant admitted that she met with Morris on at least two occasions prior to the scheduled pre-trial conference when she decided to enter a guilty plea, and that she understood what some of the evidence against her consisted. And Morris unequivocally testified that he reviewed discovery with Movant as well as the indictment, that he explained what the conspiracy charge meant, that he explained the elements of the offenses on at least two occasions, that he investigated the alleged battered woman's syndrome defense and was unable to substantiate any alleged threats by Movant's co-defendant and in any event did not believe such threats would amount to coercion, and that on at least two occasions he went over the binding plea offer, talked to Movant about the terms of the binding plea, and went through the evidence and her sentencing exposure. Moreover, AUSA Ghose summarized the evidence in detail at the plea hearing, and Movant did not subsequently express any surprise that the Government was in possession of this evidence, suggesting that she was generally familiar with the evidence in the case.

Although Movant argues that Morris must have lied on the stand because he "conceded that symptoms of addiction include deceit and minimizing" [Doc. 226 at 30], the Court's impression of Morris was that he actually was forthright and

honest about his addiction, how it affected his marriage, and how it affected his representation of clients.  In Morris's own words, he "ha[s] nothing to hide, to be honest.  I mean it is what it is."  (Doc. 208 at 30).  While Morris conceded that his drug abuse eventually affected his representation of other clients after his representation of Movant had ended, he emphatically denied that his use of drugs – which he did not concede he was abusing at the time – impacted his representation of Movant.  (Doc. 208 at 906).  Morris's recollection of the facts of the case and his meetings were lucid, coherent, and detailed, and much of his testimony about his representation of Movant was corroborated by other witnesses, including the fact that his paralegal did not remember him being impaired during this case, his intern did not remember his behavior changing until after his representation of Movant was over, and both women indicated that he had a good grasp of the discovery and the evidence in the case.  And even though AUSA Ghose thought Morris was "off," he and Inspector Potter both testified that Morris was coherent and had a good grasp of the facts.

On the other hand, Movant's testimony did not seem credible.  It is clear that she has lied to the Court under oath since her current testimony essentially contradicts everything she stated under oath during her plea.  (*See, e.g.,* Doc. 207 at 63-64).  There are other indicia of Movant's lack of credibility.  On direct examination she testified that despite telling the Court that she understood the charges against her during the plea colloquy, she was not telling the truth, but then

38

on cross-examination she admitted that when she appeared before the Court to enter her plea she did, in fact, tell the truth. (*See* Doc. 207 at 63-4, 120, 126). She also begrudgingly admitted that she entered her plea agreement voluntarily and by choice. (*Id.* at 143-44). Yet on redirect, she again changed her testimony and indicated that she was not truthful during her plea. (*Id.* at 145). This testimony also was not the first time Movant has changed her story - she apparently did so during different interviews with the postal inspectors, and she told her family that she was innocent, which she later admitted was untrue. (*Id.* at 64; *see also* Doc. 208 at 210). Regardless, despite Movant's present self-serving statements that she did not understand the binding plea agreement, the charges against her, or the sentence she would receive, she has not overcome the strong presumption of the veracity of her sworn statements during the plea hearing. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). *See also Patel v. United States*, 252 F. App'x 970, 975 (11th Cir. 2007) ("There is a strong presumption that statements made during the plea colloquy are true. . . . Consequently, a defendant bears a heavy burden to show that his statements under oath were false."); *United States v. Perkins*, No. 00-1120, 2000 WL 1425123, at *1 (2d Cir. Sept. 27, 2000) ("Statements made by a defendant during an allocution hearing carry a strong presumption of veracity, . . . and a district court does not abuse its discretion in relying on them to discredit later unsupported assertions...."); *United States v. Mosley*, No. 93-1829, 1994 WL 503016, at *3 (7th Cir. Sept. 14, 1994) ("Self-serving statements offered after the

39

plea hearing generally fall in the face of contradictory voluntary statements made by the defendant during a plea hearing - the latter are presumed true.").  And where, as here, a Movant's later "allegations are in direct conflict with [her] statements during the plea colloquy, and [she] has produced no evidence to challenge the veracity of her sworn testimony," then "self-serving statements" are not required to be credited.  *Patel*, 252 F. App'x at 975.  Moreover, the evidence from other witnesses, including Inspector Potter and AUSA Ghose, as well as Joanna Hobgood, support that Movant understood everything prior to, during, and after, her plea.  Thus, Movant has not demonstrated that Morris provided deficient representation by failing to review discovery and the facts of the case with Movant.

### 3.    *"Inadequate" Plea*

While Movant claims that Morris procured an "inadequate" plea, it is not clear what Movant believes would be adequate.  Indeed, 188 months – or approximately fifteen and a half years – was the lowest end of the guideline range, and could reasonably be seen as a better deal than that which the Government had first offered, which was a plea to Count One (which contained a higher maximum of twenty-five years versus Count Two's maximum of twenty years) for a sentence recommendation of the middle of the guideline range between fifteen and nineteen years.  In contrast, Movant faced the potential of forty-five years of imprisonment after a trial where by all accounts the evidence would have been overwhelming.  And after a trial, or even during a non-negotiated plea where the Government

40

presented this overwhelming evidence, Morris thought that a district judge potentially could sentence Movant to the maximum forty-five years. That worst case scenario might be unlikely. But in a case involving a seriously injured shooting victim, it was not unreasonable for counsel to be concerned about the probability of a high sentence.

Additionally, the binding plea offered Movant the possibility of reducing her sentence even more if she would provide information about previous robberies, with which her co-defendants claimed she was involved.[7] The Court cannot say that Morris's decision to advise Movant to take the binding plea for a guaranteed 188 months with a chance to reduce that sentence by cooperating was professionally unreasonable.

Moreover, both the Government and Morris gave Movant the opportunity to withdraw her plea during her proffer session, which she voluntarily did not do. Indeed, Morris spent over an hour with Movant when, as he and Ms. Hobgood both testified, he went over the facts of the case, the strength and weaknesses thereof, and Movant's sentencing exposure if she were to go to trial versus maintain her plea. But Morris also told Movant that if she wanted to go to trial he

------

[7] Despite the fact that her co-defendants testified that Movant had been involved in more than one previous postal robbery and she could have lessened her sentence by providing information to the Government regarding those robberies, she did not do so during her proffer session.

41

would do so, and it was her decision to maintain her plea.  She cannot now claim that her plea was forced merely because in hindsight she has changed her mind.

b.   <u>Movant Cannot Show Prejudice.</u>

Even if, for the sake of argument, Morris's representation of Movant was deficient in the manners Movant claims, Movant has failed to indicate how she was prejudiced by any alleged infrequent or brief visits, Morris's alleged failure to discuss the case and review discovery with her, and/or his negotiation of an "inadequate" plea.  With regard to the alleged infrequent and brief visits, Movant has not demonstrated how more or longer visits would have led to a better outcome.  *See Hill v. Mitchell*, 400 F.3d 308, 325 (6th Cir. 2005) (finding no ineffective assistance of counsel where the petitioner provided "no explanation of how additional meetings with his counsel, or longer meetings with his counsel, would have led to new or better theories of advocacy or otherwise would have created a reasonable probability of a better outcome."); *United States ex rel. Testamark v. Vincent*, 496 F.2d 641 (2d Cir. 1974) (rejecting the petitioner's ineffective assistance of counsel claim based on his attorney's infrequent visits where he failed to show that those infrequent visits impaired the defense).  Moreover, even if the Court were to believe Movant's claim that she did not know anything about to what she was agreeing because Morris never went over the plea with her, AUSA Ghose also thoroughly discussed everything with Movant prior to her plea and prior to her proffer to ensure that she did, in fact, understand

42

everything she now claims she did not.  And in connection with Morris's alleged failure to review discovery with her, AUSA Ghose also went over the discovery with her on at least two occasions, which he claims she understood and that she did not seem surprised.

Finally, to the degree that Movant argues that Morris negotiated an "inadequate plea," the only potential prejudice she claims is that "[h]ad she understood that the plea was binding she would not have gone forward but would have instructed [Morris] to try further negotiations."  (Doc. 226 at 10).  And, according to Movant, had she not been bound by a "straight jacket plea," there is a "reasonable chance the penalty would have been less severe."[8]  (*Id.*).  "Reasonable chance," however, is not the standard Movant must meet.  Instead, Movant must show that there is a reasonable *probability* that the outcome would have been different, which she has not done.

Movant appears to believe that a binding plea – which she refers to as a "straight-jacket" plea – is somehow presumptively deficient.  The undersigned disagrees.  All cases are different, and it certainly cannot be said as an across-the-board proposition that binding pleas are necessarily inferior.  While a binding plea

---

[8] While Movant characterizes this case as a "single-incident case" and that as a result there is "zero possibility" that she ultimately would receive the maximum forty-five years [Doc. 226 at 3 n.1], the reality is quite different, as her co-defendants would have testified that she told them on more than one occasion that she previously assisted in more than one successful postal robbery, albeit that she was never caught or charged.

might impose a "straight-jacket," it does so for all parties *and* the sitting judge. Thereby, such a plea provides certainty and security for a Defendant who might otherwise face the risk of a sentencing judge imposing something higher than what the parties recommended.  This case, among other aggravating factors, involved a victim who was shot and seriously injured.  Under federal law, the victim was entitled to be heard at sentencing independently of the Government's presentation, and would not be bound by the Government's plea argument obligations.  In such a case, there is a particular risk that a sentencing judge might consider and impose a sentence in excess of a mere non-binding recommendation.  For these and other reasons, it was a significant benefit to reach an agreement that protected Movant in case the court imposed any sentence above the low end of the guideline range. At a minimum, it was not unreasonable for counsel to conclude that this was a good deal, and on these facts superior to a non-binding agreement.

Indeed, as AUSA Ghose testified, the deal that Movant got was the best deal she was going to get, and any further negotiations would have been futile.  Thus, had Movant not entered the binding plea, Movant faced a non-negotiated plea, possibly to both counts of the indictment, where the Government could have asked for the maximum sentence and/or enhancements for obstruction, role in the offense, and abuse of a position of trust.  Or, after trial on both counts and the Court having heard the overwhelming evidence against Movant – including testimony from the victim and her co-defendants' testimony that Movant had

44

successfully assisted in previous armed postal robberies and had never been caught – there is no reasonable probability that Judge Thrash would have sentenced her to less than the lowest possible guideline range sentence of 188 months which she received with her binding plea. Moreover, any speculation that a presentation of psychological facts at sentencing would have resulted in a lower sentence is just that, *i.e.,* speculation. Indeed, the Court denied Mr. Strongwater's request for expert funds to hire an expert as unsupported. (*See* Doc. No. 77). Movant under her plea deal already received the low end of the guidelines, which according to AUSA Ghose already reflected the Government's consideration of the psychological issues. Whether Movant would have fared better after a trial or pursuant to a non-negotiated plea before the sentencing judge, is at best conjecture if not downright doubtful. Movant has therefore failed to demonstrate how she suffered prejudice from any of the alleged deficiencies– *i.e.,* that a decision not to take the binding plea to one count and receive the lowest sentence in her guideline range would have been rational in this case.

IV.   Conclusion

Based on the foregoing reasons, **IT IS HEREBY RECOMMENDED** that LaTonya Evans's motion to vacate sentence [Docs. 161, 165] be **DENIED WITH PREJUDICE**.

AO 72A
(Rev.8/82)

V.     Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing § 2255 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."   28 U.S.C. § 2253(c)(2) provides that a certificate of appealability ("COA") may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  In order for the certification requirement to fulfill its function of weeding out frivolous appeals, a court should not automatically issue a COA; rather, the applicant must prove "something more than the absence of frivolity" or "the existence of mere 'good faith' on his or her part."  *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (citations omitted).

Movant need not prove, however, that some jurists would grant the § 2255 motion.  *See id.*  "The question is the debatability of the underlying constitutional claim, not the resolution of that debate."  *See Lamarca v. Secretary, Dep't of Corr.*, 568 F.3d 929, 934 (11th Cir. 2009) (citing *Miller-El*, 537 U.S. at 325).  In other words, Movant need only demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Based on the foregoing discussion of Movant's claims, reasonable jurists would not find "debatable or wrong" the

46

undersigned's determination that Movant did not demonstrate ineffective assistance of counsel. *See Slack*, 529 U.S. at 484.

Accordingly, **IT IS FURTHER RECOMMENDED** that a COA be **DENIED**.

The Clerk is **DIRECTED** to terminate the reference to the undersigned Magistrate Judge.

**IT IS SO RECOMMENDED AND ORDERED** this 28th day of March, 2018.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

47